**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DEMOCRACY FORWARD FOUNDATION,

*Plaintiff*,

 vs.

U.S. DEPARTMENT OF JUSTICE, et al.,                Case No. 25-cv-1535-APM

*Defendants*.

---

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S MOTION FOR A PRESERVATION ORDER**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

I.   Secretary Rubio Has Used Signal to Communicate Regarding Critical Foreign
     Policy Matters ............................................................................................... 2

II.  The Trump Administration Initiates its El Salvador Rendition Policy .............................. 5

III. DFF Submits the FOIA Request at Issue Seeking Records Concerning the
     Administration's El Salvador Rendition Policy and Inappropriate Signal Use ................. 6

IV.  Responsive Signal Records Remain at Serious Risk of Deletion ...................................... 7

LEGAL STANDARD ................................................................................................... 9

ARGUMENT ............................................................................................................... 11

I.   DFF Is Likely Entitled to the Production of the Signal and Similar Records It Seeks
     to Preserve, and Easily Raises a "Serious Legal Question" About its Entitlement to
     Those Records ............................................................................................... 12

     A.   The Materials DFF Requests Are "Agency Records" ............................................. 12

     B.   There is Undisputed Evidence—Including Secretary Rubio's Own
          Statements—Indicating that Responsive Signal Records Exist ............................... 13

II.  DFF is Likely to Experience Irreparable Harm Absent a Preservation Order ................. 15

III. The Balance of Equities and the Public Interest Likewise Favor Issuance of a
     Preservation Order ........................................................................................ 16

CONCLUSION ............................................................................................................ 19

# TABLE OF AUTHORITIES

## CASES

*Am. Oversight v. Hegseth*, 2025 WL 1721995 (D.D.C. June 20, 2025)............................... passim

*Am. Oversight v. U.S. Dep't of Gov't Efficiency*, 2025 WL 993518
 (D.D.C. Apr. 2, 2025) ..................................................................................................... passim

*Cause of Action Inst. v. U.S. Dep't of Just.*, 2019 WL 12070403
 (D.D.C. Apr. 25, 2019) ................................................................................................... passim

*Chambers v. U.S. Dep't of Interior*, 568 F.3d 998 (D.C. Cir. 2009) ........................................... 10

*Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 565 F. Supp. 2d 23
 (D.D.C. 2008) ....................................................................................................................... 16, 17

*Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8
 (D.D.C. 2025) ....................................................................................................................... 11, 17

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 2016 WL 10676292
 (D.D.C. Dec. 12, 2016) ............................................................................................................ 10

*Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 827 F.3d 145 (D.C. Cir. 2016) ............... 13

*J.G.G. v. Trump*, 25-cv-00766-JEB, 2025 WL 1119481 (D.D.C. Apr. 16, 2025)......................... 6

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146 (1989) ....................................................... 18

*Karem v. Trump*, 960 F.3d 656 (D.C. Cir. 2020)........................................................................... 17

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ............................................. 18

*Nken v. Holder*, 556 U.S. 418 (2009) .......................................................................................... 17

*Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025).......................................................................... 6

*Pub. Citizen v. U.S. Dep't of State*, 276 F.3d 634 (D.C. Cir. 2002) ............................................ 15

*Quintero Chacón v. Dickerson*, No. 25-cv-00050 (M.D. Ga. filed Feb. 10, 2025) ...................... 6

*U.S. Dep't. of Just. v. Tax Analysts*, 492 U.S. 136 (1989)............................................................ 13

*United States ex rel. Staggers v. Medtronic, Inc.*, 2022 WL 4078969
 (D.D.C. Sept. 6, 2022) ............................................................................................................. 10

*Wadelton v. U.S. Dep't of State*, 208 F. Supp. 3d 20 (D.D.C. 2016)............................................ 10

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841
(D.C. Cir. 1977) ............................................................................................. 11, 12, 14

## RULES AND REGULATIONS

36 C.F.R. § 1222.26 ........................................................................................................ 4

## OTHER AUTHORITIES

Am. Compl., *Abrego Garcia v. Noem*, No. 25-cv-00951 (D. Md. July 2, 2025),
ECF No. 211-3 ............................................................................................... 6, 15

Compl., *Abrego Garcia v. Noem*, No. 25-cv-00951 (D. Md. Mar. 24, 2025), ECF No. 1 ............ 5

Compl., *J.G.G. v. Trump*, No. 25-cv-00766-JEB (D.D.C. Mar. 15, 2025), ECF No. 1 ................ 5

Dell Cameron, *Here's What Happened to Those SignalGate Messages*, Wired
(Apr. 15, 2025), https://perma.cc/C5A2-2BLW ............................................................ 3

Devlin Barrett et al., *U.S. Deports More Detainees to El Salvador, Calling Them 'Violent
Criminals'*, N.Y. Times (Mar. 31, 2025), https://perma.cc/FZM3-S84A.................................. 5

Evelyn Hockstein, *U.S. National Security Advisor Mike Waltz Attends a Cabinet Meeting
Held by President Trump at the White House in Washington*, Reuters (May 1, 2025),
https://perma.cc/75MC-D7Z8 ............................................................................... 8

Frances Robles et al., *U.S. Botched a Deal to Swap Venezuelans Held in El Salvador
for Americans*, N.Y. Times (July 8, 2025), https://perma.cc/F75N-TZC5 .......................... 5, 15

*General Records Schedule 6.1: Email and Other Electronic Messages Managed under a
Capstone Approach*, Nat'l Archives & Recs. Admin. (Jan. 2023),
https://perma.cc/6Q48-ZJ7N................................................................................ 4

Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*,
The Atlantic (Mar. 24, 2025), https://perma.cc/4AQQ-FRMW ................................................ 2

Julie Turkewitz et al., *'Alien Enemies' or Innocent Men? Inside Trump's Rushed Effort to
Deport 238 Migrants*, N.Y. Times (Apr. 16, 2025), https://perma.cc/7E7C-SZ2V ................ 5

Matthew Lee, *Rubio Says El Salvador Offers to Accept Deportees from US of Any
Nationality, Including Americans*, AP News (Feb. 4, 2025), https://perma.cc/CX7D-
6LNJ.............................................................................................................. 5

Moxie Marlinspike, *Disappearing Messages for Signal: The Timer Has Come*, Signal
(Oct. 11, 2016), https://perma.cc/32VG-Y697 ............................................................ 3

*NARA Records Schedule*, Nat'l Archives (Oct. 19, 2021), https://perma.cc/FXD5-973U ............. 4

Ram Iyer & Ivan Mehta, *TeleMessage, a Modified Signal Clone Used by US Government Officials, Has Been Hacked*, TechCrunch (May 5, 2025), https://perma.cc/R9DW-ZL3R ................................................................................ 8

Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, at 7:59 ET), https://perma.cc/HF48-BUXJ ................................................................................ 5

Secretary Marco Rubio (@SecRubio), X (Mar. 31, 2025, at 8:25 ET), https://perma.cc/B8T7-ZPTL ................................................................................ 5

*Set and Manage Disappearing Messages*, Signal Support, http://perma.cc/H8Z4-AUFR (last visited July 10, 2025) ...................................................................................... 3

Steve Witkoff (@SteveWitkoff), X (Mar. 26, 2025, at 9:20 ET), https://perma.cc/8QBC-MJ8T ................................................................................ 4

Steven Cheung (@StevenCheung47), X (May 1, 2025, at 17:17 ET), https://perma.cc/XY3F-9ZK4 ................................................................................ 9

Wash. Post, *Rubio on Signal chat: 'Someone made a big mistake'* (Mar. 26, 2025, at 16:16 ET), https://perma.cc/5WNA-9E7P ................................................................ 4

Zolan Kanno-Youngs et al., *Behind Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*, N.Y. Times (May 1, 2025), https://perma.cc/ZXH3-X2RF ................................................................................ 5

## INTRODUCTION

Plaintiff Democracy Forward Foundation ("DFF") asks this Court to issue a narrowly tailored preservation order to prevent the deletion of records of public significance that are potentially responsive to a Freedom of Information Act ("FOIA") request at issue in this litigation. This relief is modest and necessary to prevent irreparable harm given clear evidence that a high-ranking official who likely has responsive records in his possession has failed to comply with records preservation obligations.

DFF's relevant FOIA request, submitted to Defendant U.S. Department of State ("State"), seeks the text message and Signal records of Secretary of State Marco Rubio concerning the Trump Administration's extraordinary policy of rendering people to El Salvador for indefinite detention without due process ("the El Salvador rendition policy"), as well as records that would show the extent of Secretary Rubio's use of Signal or similar applications for agency business in the wake of reporting showing he and other senior officials used Signal with autodelete enabled to communicate about critical policy matters. Secretary Rubio has personally acknowledged his use of Signal to communicate with other senior government officials in a chat subject to automatic deletion. Another court in this district has now found that State and other agencies likely violated federal records laws through Secretary Rubio and other officials' use of Signal to communicate about government actions.

Despite these extraordinary circumstances and repeated requests from DFF, State has failed to take action to collect and preserve Secretary Rubio's potentially responsive Signal records. DFF thus respectfully requests that this Court order State to promptly collect potentially responsive Signal and similar records from Secretary Rubio's devices and report on its preservation measures to ensure those records are not deleted. A preservation order requiring

these steps is necessary here to ensure that DFF, and the public it seeks to serve, have access to the public records responsive to its FOIA request.

Preservation orders are appropriate in FOIA cases where there is a risk that records potentially responsive to a request will be removed or destroyed, irreparably harming a requester's ability to access documents to which they are legally entitled. *See Cause of Action Inst. v. U.S. Dep't of Just.*, 2019 WL 12070403, at *1–2 (D.D.C. Apr. 25, 2019) (Mehta, J.). This Court has previously issued a preservation order in a FOIA case when an official used a personal email account for agency business, *id.*, and courts in this district have recently ordered the preservation of Signal messages in cases where the evidence of failure to preserve agency records on Signal was less clear than it is here, *see Am. Oversight v. U.S. Dep't of Gov't Efficiency* ("*DOGE*"), 2025 WL 993518, at *1 (D.D.C. Apr. 2, 2025). DFF is entitled to the records it seeks here and will be irreparably harmed without this Court's intervention. The minimal burden this order will place on State pales in comparison to the public interest served by requiring preservation of the important public records at stake.

## BACKGROUND

I. **Secretary Rubio Has Used Signal to Communicate Regarding Critical Foreign Policy Matters.**

On March 24, 2025, *The Atlantic* revealed that numerous high-ranking government officials in the Trump Administration, including Secretary Rubio, had used "Signal"—a non-governmental messaging application—to communicate regarding official business, including regarding foreign affairs matters of critical importance.[1] Signal advertises a feature called "disappearing messages," whereby users can set timers to automatically delete the messages in a

---

[1] *See* Jeffrey Goldberg, *The Trump Administration Accidentally Texted Me Its War Plans*, The Atlantic (Mar. 24, 2025), https://perma.cc/4AQQ-FRMW.

given text thread after short periods of time, ranging from minutes to up to four weeks.[2] Any participant in a chat can enable disappearing messages, and once someone does, the setting applies to all parties of a conversation[3] and any new messaging after the timer for deletion has been set or modified.[4] Messages set to autodelete will have a timer countdown icon that is visible at the bottom of the message bubble and the chat header will also include a timer icon.[5]

For the matter at the heart of what has become known as "Signalgate,"[6] *The Atlantic* reported that senior Trump officials had set the autodeletion for some messages to "1 week" and for others to "4 weeks." *The Atlantic* provided the below sample screenshot (annotations are by DFF):



The timer icon followed by "4w" in the chat header indicates the messages in the thread have been set to auto delete in four weeks.

The bottom of each message bubble in the chat also has a timer icon, further indicating they are all disappearing messages.

*The Atlantic* surmised that "MAR" was Secretary of State "Marco Antonio Rubio," which as discussed *infra*, Secretary Rubio confirmed. The timer icon at the bottom of Secretary Rubio's message indicates that it is set to auto delete.

---

[2] *See* Moxie Marlinspike, *Disappearing Messages for Signal: The Timer Has Come*, Signal (Oct. 11, 2016), https://perma.cc/32VG-Y697 (blog post by the creator of Signal announcing the launch of the disappearing messages feature); *see also Set and Manage Disappearing Messages*, Signal Support, http://perma.cc/H8Z4-AUFR (last visited July 10, 2025).
[3] Marlinspike, *supra* note 2.
[4] Signal Support, *supra* note 2.
[5] *Id.*
[6] *See, e.g.*, Dell Cameron, *Here's What Happened to Those SignalGate Messages*, Wired (Apr. 15, 2025), https://perma.cc/C5A2-2BLW.

The four-week timeframe for autodeletion set for the above chat thread is far shorter than the generally applicable records preservation schedules for most federal electronic communications records, which range from three years for administrative staff to *permanent* retention for senior officials like agency heads.[7]

The statements of another State official included in the Signal group, Ambassador Steve Witkoff, further indicate that State officials' use of Signal was conducted on personal devices using non-official electronic messaging applications.[8] Ambassador Witkoff explained that he did not send messages in the publicly disclosed Signal chat because "I had no access to my personal devices," while on a foreign trip in Moscow.[9]

Shortly after *The Atlantic* broke "Signalgate," Secretary Rubio publicly acknowledged that he sent and received messages via Signal "for purposes of coordinating" foreign policy matters.[10] Specifically, responding to a question on "Signalgate" at a news conference on March 26, Secretary Rubio said:

> Just speaking for my role, I contributed to it[11] twice. I identified my point of contact, which is my Chief of Staff. And then later on, I think three hours after the White House's official announcements had been made, I congratulated the members of the team.[12]

In separate litigation in this district concerning executive branch officials' use of Signal to conduct government business, Defendants—including Secretary Rubio—"d[id] not dispute that

---

[7] *See General Records Schedule 6.1: Email and Other Electronic Messages Managed under a Capstone Approach*, Nat'l Archives & Recs. Admin. (Jan. 2023), https://perma.cc/6Q48-ZJ7N; 36 C.F.R. § 1222.26; *see also NARA Records Schedule*, Nat'l Archives (Oct. 19, 2021), https://perma.cc/FXD5-973U.

[8] Steve Witkoff (@SteveWitkoff), X (Mar. 26, 2025, at 9:20 ET), https://perma.cc/8QBC-MJ8T.

[9] *Id.*

[10] Wash. Post, *Rubio on Signal chat: 'Someone made a big mistake,'* at 0:02–03 (Mar. 26, 2025, at 16:16 ET), https://perma.cc/5WNA-9E7P.

[11] By "it," Secretary Rubio is referring to the "Houthi PC small group" chat thread on Signal depicted in *The Atlantic*'s screenshot, *supra* p. 3.

[12] *Rubio on Signal chat: 'Someone made a big mistake,' supra* note 10, at 0:36–50.

there is or was a wider use of Signal" by the relevant high-ranking officials than solely the chat accidentally disclosed to a journalist from *The Atlantic*. *See Am. Oversight v. Hegseth*, 2025 WL 1721995, at *8 (D.D.C. June 20, 2025).

## II.    The Trump Administration Initiates its El Salvador Rendition Policy.

Secretary Rubio's March 26 confirmation of his Signal usage coincided with policy developments of critical national importance. On March 15, 2025, the Trump Administration rendered more than 200 people from the United States to El Salvador to be detained indefinitely in a notoriously brutal prison;[13] it moved an additional 17 people to El Salvador for detention on March 31.[14] Secretary Rubio played a central role in securing El Salvador's agreement to detain people rendered there by the United States government.[15]

The Administration's El Salvador rendition policy has been the subject of extraordinary public concern and numerous legal challenges.[16] There are also serious questions about whether Administration officials intentionally failed to comply with court orders prohibiting the removal of these individuals to El Salvador and requiring action to return individuals wrongfully rendered

---

[13] Zolan Kanno-Youngs et al., *Behind Trump's Deal to Deport Venezuelans to El Salvador's Most Feared Prison*, N.Y. Times (May 1, 2025), https://perma.cc/ZXH3-X2RF; Secretary Marco Rubio (@SecRubio), X (Mar. 16, 2025, at 7:59 ET), https://perma.cc/HF48-BUXJ.

[14] Devlin Barrett et al., *U.S. Deports More Detainees to El Salvador, Calling Them 'Violent Criminals'*, N.Y. Times (Mar. 31, 2025), https://perma.cc/FZM3-S84A; Secretary Marco Rubio (@SecRubio), X (Mar. 31, 2025, at 8:25 ET), https://perma.cc/B8T7-ZPTL.

[15] *See, e.g.*, Matthew Lee, *Rubio Says El Salvador Offers to Accept Deportees from US of Any Nationality, Including Americans*, AP News (Feb. 4, 2025), https://perma.cc/CX7D-6LNJ; s*ee also* Frances Robles et al., *U.S. Botched a Deal to Swap Venezuelans Held in El Salvador for Americans*, N.Y. Times (July 8, 2025), https://perma.cc/F75N-TZC5.

[16] *See, e.g.*, Julie Turkewitz et al., *'Alien Enemies' or Innocent Men? Inside Trump's Rushed Effort to Deport 238 Migrants*, N.Y. Times (Apr. 16, 2025), https://perma.cc/7E7C-SZ2V; *see also* Compl., *J.G.G. v. Trump*, No. 25-cv-00766-JEB (D.D.C. Mar. 15, 2025), ECF No. 1; Compl., *Abrego Garcia v. Noem*, No. 25-cv-00951 (D. Md. Mar. 24, 2025), ECF No. 1.

to El Salvador.[17]

The El Salvador rendition policy remains a matter of significant ongoing public concern. The vast majority of individuals sent to El Salvador continue to be detained there. And just last week, court filings provided a firsthand account from one of these individuals of the torture he experienced in Salvadoran prison.[18]

## III.    DFF Submits the FOIA Request at Issue Seeking Records Concerning the Administration's El Salvador Rendition Policy and Inappropriate Signal Use.

Because moving people from the United States to a foreign prison for apparently indefinite detention without due process is an issue of extraordinary public concern, on March 26, 2025, DFF submitted multiple FOIA requests to State to shed light on the Administration's policy and actions. The first request (F-2025-13423) seeks records, broadly speaking, related to the agreements, guidance, and directives involved in rendering of individuals to be detained in El Salvador. Compl. ¶ 17, ECF No. 1. DFF submitted identical requests to the Departments of Justice and Homeland Security. *Id*. Those requests are included in this litigation but are not the subject of the instant motion.

DFF also submitted a FOIA request to State (F-2025-13426), the focus of this motion, seeking the following Signal and similar communications records:

> (1) All text messages or messages on messaging platforms (such as Signal messages, X Direct messages, Slack, WhatsApp, Teams, GChat or Google Hangouts, etc.) sent and received by the [Department of State] officials listed below that include any of the following terms:
>
> Officials:
> i. Secretary Marco Rubio

---

[17] *See, e.g.*, *J.G.G. v. Trump*, 25-cv-00766-JEB, 2025 WL 1119481 (D.D.C. Apr. 16, 2025); *see also Noem v. Abrego Garcia*, 145 S. Ct. 1017 (2025); *Quintero Chacón v. Dickerson*, No. 25-cv-00050 (M.D. Ga. filed Feb. 10, 2025).

[18] *See* Am. Compl., *Abrego Garcia v. Noem*, No. 25-cv-00951 (D. Md. July 2, 2025), ECF No. 211-3.

ii. Counselor and Chief of Staff Mike Needham

Terms:
I. "Alien Enemies Act"
II. AEA
III. "Tren de Aragua"
IV. TdA
V. "Terrorism Confinement Center"
VI. CECOT
VII. Thugs
VIII. Boasberg
IX. "Court Order"

(2) Records sufficient to identify the (1) group names (2) deletion timelines (3) channel participants for all Signal groups on any devices DOS officials listed in Item 1 use for official business.

McGrath Declaration ("McGrath Decl.") Ex. 1, at 1–2. DFF's request for Signal and similar records seeks documents created through the date the agency conducts its search. *Id*. State has still not completed its search, *see* Joint Status Report, ECF No. 10, so recent records of communication that concern, for example, new developments in the Administration's policy of sending individuals to detention in El Salvador and allegations of maltreatment there are likely to be responsive to DFF's request. Additionally, part (2) of the request seeks records—showing Singal chat group names, participants, and deletion timelines—that would shed light on the extent of potentially inappropriate and unlawful Signal use for communication among senior government officials.

## IV.    Responsive Signal Records Remain at Serious Risk of Deletion.

On March 26, 2025, DFF sent a letter to Secretary Rubio and other agency heads asking them "to preserve any record at risk of deletion without preservation in violation of the Federal Records Act." McGrath Decl. Ex. 2, at 1. DFF noted that it has several pending FOIA requests "for communications of officials" and that "those records are at risk of permanent deletion." *Id.* at 2. To date, DFF has received no response to this March 26 letter.

Despite the tremendous scrutiny that Trump Administration officials received for their use of Signal in March, evidence has emerged that Secretary Rubio and other officials have continued to use Signal or equivalent technologies to communicate with other high-ranking government officials. A reporter's photo of an April 30, 2025 cabinet meeting shows that Secretary Rubio continued to communicate with then-National Security Advisor Mike Waltz using a modified version of the Signal application offered by the company Telemessage.[19] Specifically, Reuters published the photo below of Mr. Waltz's phone during the April 30 cabinet meeting:


[20]

The photo shows message threads labeled "JD Vance," and "Gabbard," the last name of Tulsi Gabbard, the Trump Administration's Director of National Intelligence. It also shows that messages were exchanged on a text thread, the beginning of which is obscured, ending in "ubio" at 10:40 AM, apparently on that same day,[21] indicating that Secretary Rubio continued to use

---

[19] Ram Iyer & Ivan Mehta, *TeleMessage, a Modified Signal Clone Used by US Government Officials, Has Been Hacked*, TechCrunch (May 5, 2025), https://perma.cc/R9DW-ZL3R.

[20] Evelyn Hockstein, *U.S. National Security Advisor Mike Waltz Attends a Cabinet Meeting Held by President Trump at the White House in Washington*, Reuters (May 1, 2025), https://perma.cc/75MC-D7Z8.

[21] Generally, if a message timestamp shows only the time and not a date, it means the message was sent on the same day as the time displayed, in this case April 30, 2025.

Signal to communicate with other government officials more than a month after "Signalgate" was reported.[22]

On May 14, 2025, DFF filed suit to compel State to produce records responsive to its FOIA requests, including its request seeking Secretary Rubio's Signal and similar records. Compl. On June 18, 2025, Defendants answered DFF's complaint. Answer, ECF No. 7.

Two days later, on June 20, 2025, another court in this district found, in a suit brought under the Administrative Procedure Act and the Federal Records Act, that State and other agencies had likely failed to comply with Federal Records Act obligations because of the use of Signal and its autodelete functions by high-ranking officials, including Secretary Rubio. *See Hegseth*, 2025 WL 1721995, at *8. That court ordered that the Federal Records Act violations be referred to the Attorney General for the initiation of an enforcement action, but it did not directly order preservation of relevant records—except to the very limited extent mutually agreed upon by the parties—distinguishing the relief available in APA cases where access to records was not at issue from the relief available in a FOIA case. *Id.* at *11–12. On June 26, 2025, DFF sent State a letter reiterating its previous preservation requests and urging the agency to take prompt action to collect and preserve Signal records potentially responsive to its requests in this litigation. *See* Joint Status Report ¶ 5. As of the date of this motion, State has yet to indicate to DFF that it has acted to collect potentially responsive Signal records to ensure their preservation. *Id.* ¶ 4.

## LEGAL STANDARD

In FOIA cases, as in all others, "[f]ederal courts have the inherent power to issue orders preserving information relevant to the claims and defenses brought before them." *Am. Oversight v. DOGE*, 2025 WL 993518, at *1 (quoting *United States ex rel. Staggers v. Medtronic, Inc.*,

---

[22] Steven Cheung (@StevenCheung47), X (May 1, 2025, at 17:17 ET), https://perma.cc/XY3F-9ZK4.

2022 WL 4078969, at *2 (D.D.C. Sept. 6, 2022)). Accessing responsive agency records is the crux of any FOIA lawsuit. *See Hegseth*, 2025 WL 1721995, at *12 ("In FOIA cases, . . . plaintiffs sue to recover specific records, so [a] case would become moot if such records were deleted."). "[A]n agency violates its FOIA obligations by destroying records once a FOIA request has been received." *Wadelton v. U.S. Dep't of State*, 208 F. Supp. 3d 20, 27 (D.D.C. 2016); *see also Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1004 (D.C. Cir. 2009) (collecting cases).

Although courts in this district have recently moved towards granting preservation orders as an exercise of their inherent authority to preserve relevant information, *supra Am. Oversight*, 2025 WL 993518, at *1, this court and other courts in this district have granted preservation orders in FOIA cases by applying a variation of the factors considered in granting preliminary injunctive relief more generally.[23] *See Competitive Enter. Inst. v. Off. of Sci. & Tech. Pol'y*, 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016) ("A Motion to Compel Preservation is subject to the same analytical framework as a motion for injunctive relief."). As this court has found previously, a preservation order is appropriate where a plaintiff shows (1) it is likely to succeed on the merits *or* there is at least a "serious legal question" regarding a movant's entitlement to records under FOIA; (2) a likelihood of irreparable harm absent a preservation order; and that the (3) balance of equities and public interest favor preservation. *Cause of Action Inst.*, 2019 WL 12070403, at *1–2. When assessing the likelihood of success factor in the context of a motion for preservation order in a FOIA case, this court has "opt[ed]" for a "relaxed standard," where merely "a showing of a 'serious legal question'" as to a plaintiff's entitlement to records under

---

[23] Courts have recognized that "there is no binding authority instructing [courts on] how to weigh preservation order requests," *Medtronic*, 2022 WL 4078969, at *2, so some courts have relied on their inherent authority to preserve information relevant to claims in ongoing litigation, while others have applied preliminary injunctive factors to assess whether an order is warranted.

FOIA is sufficient to show a "likelihood-of-success." *Id.* at *1 n.1 (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C. Cir. 1977)). Courts in this Circuit apply these factors on a "sliding scale." *Id.* at *1.

## ARGUMENT

The need for a preservation order in this case is clear. DFF here seeks an order to ensure preservation of a category of records—Secretary Rubio's Signal messages and similar messaging application records—that the Secretary himself has acknowledged he sent and received through a platform where they were likely subject to automatic deletion. Another court has now found that State and other agencies' Signal usage likely violated federal records preservation laws. And other courts in this district have recently issued preservation orders in FOIA cases where the indications that potentially responsive Signal records could be deleted were less firmly established than is the case here. *See Am. Oversight*, 2025 WL 993518, at *1; *Citizens for Resp. & Ethics in Wash. v. U.S. DOGE Serv.*, 769 F. Supp. 3d 8, 31 (D.D.C. 2025) (issuing a preservation order in light of "the *possibility* that representatives of the Defendant entities *may* not fully appreciate their obligations to preserve federal records" (emphasis added)). Those courts have issued preservation orders based on their inherent authority to preserve information relevant to the claims before them. *Id.* The same analysis applies here and warrants the issuance of a preservation order.

Alternately, if the court opts to apply the preliminary relief factors here, they weigh heavily in favor of granting DFF's motion. *Cause of Action Inst.*, 2019 WL 12070403, at *1–2. *First*, DFF is likely to succeed on the merits of its FOIA claim—and there is certainly a "serious legal question" at issue—because records of Secretary Rubio's communications concerning government business are agency records subject to FOIA and there is clear evidence that

responsive records exist. *Second*, DFF will be irreparably harmed if these records are not preserved, and the facts here show they are at serious risk of deletion given State's failure to comply with records retention requirements. *Third*, the balance of the equities and the public interest strongly favor an order, as the public interest in access to and preservation of the Secretary's communications records far outweigh the minimal burden placed on State to collect and preserve one category of records of a single custodian.

## I.    DFF Is Likely Entitled to the Production of the Signal and Similar Records It Seeks to Preserve, and Easily Raises a "Serious Legal Question" About its Entitlement to Those Records.

DFF has requested the Signal and similar text message records of Secretary Rubio, an official who has publicly acknowledged using Signal with an autodelete function to communicate with other government officials concerning critical policy matters. The facts here establish that DFF is likely entitled to records within Secretary Rubio's Signal and similar messaging accounts. Because the materials that DFF has requested are "agency records," and because there is substantial evidence that such records likely exist but are nonetheless at risk of deletion, DFF has easily shown at least a "serious legal question" regarding its entitlement under FOIA sufficient to satisfy the "likelihood-of-success" inquiry. *Id.* at *1. Establishing such a "serious legal question" does not require a movant to show "a mathematical probability of success." *Wash. Metro.*, 559 F.2d at 844.

### A.    The Materials DFF Requests Are "Agency Records."

DFF's FOIA request seeks, broadly speaking: (1) Secretary Rubio's text messages, including Signal and similar messages, containing terms that would likely concern the Trump Administration's El Salvador rendition policy, and (2) records that would show the group names, participants, and deletion timelines for any Signal chats Secretary Rubio used for agency

business. *Supra* p. 6–7; *see also* McGrath Decl. Ex. 1. These requested materials are plainly "agency records" subject to be produced under FOIA. To constitute an "agency record," the requested material must be: (1) "either create[d] or obtain[ed]" by an agency; and (2) "controlled" by the agency. S*ee U.S. Dep't. of Just. v. Tax Analysts*, 492 U.S. 136, 142, 144–45 (1989). In sending and receiving communications concerning government functions and policies via Signal and similar messaging applications, Secretary Rubio "created" and "obtained" the requested materials. Secretary Rubio likewise "controlled," and still controls, the requested materials by virtue of the communications being sent and received via his cellphone. As the D.C. Circuit made clear in *Competitive Enterprise Institute v. Office of Science & Technology Policy*, the fact that an agency head's practices, like Secretary Rubio's here, may have removed these records from standard agency systems or otherwise violated preservation obligations does not strip the requested materials of their "agency record" designation. 827 F.3d 145, 149 (D.C. Cir. 2016) ("[A]n agency always acts through its employees;" "records do not lose their agency character just because the official who possesses them takes them out the door or because he is the head of the agency.").

### B.    There is Undisputed Evidence—Including Secretary Rubio's Own Statements—Indicating that Responsive Signal Records Exist.

There is uncontroverted evidence that records responsive to part (2) of DFF's request exist. That part requests records "show[ing] the group names, participants, and deletion timelines for *any* Signal chats Secretary Rubio used for agency business," *supra* p. 7; McGrath Decl. Ex. 1 (emphasis added). Secretary Rubio personally confirmed his "role" in communicating with other officials in the "Houthi PC small group" chat on Signal shortly after *The Atlantic* story broke. *Supra* p. 4. Moreover, Secretary Rubio has elsewhere "not dispute[d] that there is or was a wider use of Signal." *Hegseth*, 2025 WL 1721995, at *8. Indeed, on April 30, photographs emerged

indicating that then-National Security Advisor Mike Waltz and Secretary Rubio had communicated that day via a modified form of Signal. *Supra* pp. 8–9. Substantial evidence establishes that agency records responsive to part (2) of DFF's FOIA request should exist but are in the possession of an agency official who has used Signal in a manner where records were subject to deletion.

There is also evidence indicating that records responsive to part (1) of DFF's request— seeking Secretary Rubio's Signal messages containing terms that would likely concern the Trump Administration's El Salvador rendition policy—likely exist. Again, it is uncontroverted that Secretary Rubio used Signal to communicate about foreign policy with other key Administration officials in March 2025. *Supra* p. 4. Because Secretary Rubio has elsewhere "not dispute[d] that there is or was a wider use of Signal," *Hegseth*, 2025 WL 1721995, at *8, and because the breaking of "Signalgate" coincided in time with Secretary Rubio's central role in the extraordinary policy of removing over 200 people to El Salvador, *see supra* pp. 5–6, the evidence suggests that records responsive to part (1) of DFF's request are also likely to exist. *See Wash. Metro.*, 559 F.2d at 844 (A movant need not show "a mathematical probability of success" to raise a "serious legal issue."). The April 30 report and photograph showing Secretary Rubio's continued use of Signal or a similar application for communication with the then-National Security Advisor is a further indication that records responsive to part (1) of DFF's request likely exist. *Supra* pp. 8–9.

Even if Secretary Rubio continued to use Signal or similar messaging applications in a manner where the records are subject to automatic deletion, making some responsive records unavailable already—which is likely given his established use of autodelete—there have been

significant recent developments regarding the Administration's El Salvador rendition policy,[24] and Secretary Rubio has been a key official implementing that policy.[25] DFF's request sought records through the date the search was conducted, McGrath Decl. Ex. 1, and State still has not collected records potentially responsive to this request, Joint Status Report ¶ 4. Consequently, there are likely ongoing and recent Signal or similar messaging communications likely to be responsive to the part of DFF's request that concerns the El Salvador rendition policy but at risk of deletion. *See Pub. Citizen v. U.S. Dep't of State*, 276 F.3d 634, 644 (D.C. Cir. 2002) (finding a search cut-off date as of the "date-of-*search*" to be the presumptively reasonable timeframe absent compelling justification for an earlier cut-off).

## II.    DFF is Likely to Experience Irreparable Harm Absent a Preservation Order.

Without issuance of a preservation order in short order, DFF will be irreparably harmed as the records it seeks are demonstrably at risk of loss or destruction. This court has recognized that the loss of records responsive to a FOIA request constitutes irreparable harm to the requestor. *See Cause of Action Inst.*, 2019 WL 12070403, at *1. This is so, because "[i]n FOIA cases, . . . plaintiffs sue to recover specific records, so the case would become moot if such records were deleted." *Hegseth*, 2025 WL 1721995, at *12. This is a rare and unique case in which the likelihood that responsive records will be lost without a preservation order is clear. Secretary Rubio has himself acknowledged that he used Signal, with autodelete enabled, to communicate with other high-ranking officials about government actions of extraordinary

---

[24] *See, e.g.*, Am. Compl., *Abrego Garcia*, 25-cv-00951, ECF No. 211-3
[25] *See, e.g.*, Robles et al., *supra* note 15.

consequence. *Supra* p. 4. And the *Hegseth* court has found that these practices likely failed to lawfully preserve the very form of records DFF seeks here. *Hegseth*, 2025 WL 1721995, at *8.

Yet, despite these extraordinary circumstances, State has not complied with DFF's repeated requests that it collect and preserve potentially responsive Signal and similar records to ensure that they are not deleted. *See* Joint Status Report; McGrath Decl. ¶ 7. Given these established failures to properly preserve agency records, DFF is likely to be irreparably denied access to records responsive to its request without a preservation order. Because DFF "would have absolutely no recourse in the event that records potentially responsive to its FOIA requests were destroyed," *Citizens for Resp. & Ethics in Wash. v. Off. of Admin.*, 565 F. Supp. 2d 23, 30 (D.D.C. 2008), DFF and the public it seeks to serve face irreparable harm absent the issuance of a preservation order requiring prompt collection and preservation of potentially responsive Signal and similar records.

And the records at issue here—those that would shed light on the Trump Administration's extraordinary El Salvador rendition policy and on the extent of Secretary Rubio's communications with other Administration officials through a forum where they will not be preserved—are of substantial public importance. DFF's permanent inability to access those records will harm its ability to execute its public service mission of promoting transparency and accountability in government. McGrath Decl. ¶¶ 3–4.

## III. The Balance of Equities and the Public Interest Likewise Favor Issuance of a Preservation Order.

Consideration of the balance of equities and public interest weigh heavily in favor of issuing a preservation order here, which will place a minimal burden on Defendant State, while ensuring the preservation of records of significant public interest. *See Cause of Action Inst.*, 2019 WL 12070403, at *1. "[W]hen, as here, the Government is the opposing party" the balance of

equities and public interest prongs "merge." *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (cleaned up) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

First, the instant motion seeks narrowly tailored relief that will hardly burden the agency. DFF is seeking preservation of the records associated with one custodian within one FOIA request at issue in this litigation—a narrow subset of the records sought by DFF. Moreover, another court in this jurisdiction noted in its discussion of an order to preserve Signal messages—issued by the court pursuant to the parties' mutual agreement—that "agency-head Defendants . . . did not appear to have any difficulty in following their respective agencies' policies to preserve the messages that had not yet been deleted." *Hegseth*, 2025 WL 1721995, at *5. Indeed, agency officials declared that compliance with the court's preservation order merely required taking "images" or "screenshots" of the existing Signal messages and preserving them in a government record keeping system. *Id.* In stark contrast to Defendants' minimal burden, DFF faces irreparable harm from the deletion of Secretary Rubio's Signal records, which stand to shed light on issues of national importance. *See Citizens for Resp. & Ethics in Wash.*, 565 F. Supp. 2d at 30.

Accordingly, in this year alone, multiple district judges in this jurisdiction have "exercised [their] inherent authority to issue [] preservation order[s]" of Signal messages in FOIA cases in contexts where the evidence was *less* clear that potentially responsive Signal messages were being deleted. *See, e.g.*, *Am. Oversight*, 2025 WL 993518 (citing as "concerns" DOGE's "use of 'Signal'" and "refus[al] to stipulate to its preservation obligations of documents" in exercising the court's "inherent power" to grant a preservation order); *see also Citizens for Resp. & Ethics in Wash.*, 769 F. Supp. 3d at 30–31 (citing that DOGE employees

"acknowledged using Signal" and the lack of response to CREW's request for "assurances" of record retention in exercising the court's "inherent power" to grant a preservation order).[26]

Second, the public interest weighs heavily in favor of granting DFF's requested order to preserve. If these records—which reflect the operations of State on foreign policy matters of critical importance—are lost, the public access guaranteed by FOIA will be frustrated and government transparency will suffer. *See, e.g., Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (FOIA serves as a "means for citizens to know 'what the Government is up to'" and it "defines a structural necessity in a real democracy." (citation omitted)); *see also John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (The rights afforded under FOIA create the "fundamental principle of public access" to records of the administrative state, which can often be "shielded unnecessarily from public view . . . [by] possibly unwilling official hands." (citation omitted)).

Finally, it is self-evident that the *reason* officials are employing unofficial messaging applications with auto-delete features enabled appears to be to avoid the scrutiny and accountability that comes with appropriately preserving records that may otherwise be produced under FOIA, in discovery during legal challenges, or to Congress in response to oversight inquiries. A preservation order here serves the public interest not only by preventing the deletion of records to enable access to them under FOIA, but also by preventing Congress and other parties from being deprived of access to important government records relevant to oversight and litigation matters.

---

[26] Certain of these courts even issued a preservation order "[n]otwithstanding the fact that [the government] ha[d] issued a litigation hold," explaining that the government personnel "may not fully appreciate their obligations to preserve federal records" and "absent a court order punishable by contempt . . . plaintiff would have no recourse were the records at issue not maintained and preserved pursuant only to a litigation hold letter." *Am. Oversight*, 2025 WL 993518, at *1 (citations omitted).

## CONCLUSION

For the foregoing reasons, Plaintiff DFF respectfully requests that the Court grant the instant motion and order Defendant State to take all necessary steps to collect and preserve Signal and similar records from the devices used by Secretary Rubio that are potentially responsive to FOIA request F-2025-13426. A proposed order is attached.


Dated: July 11, 2025                              Respectfully submitted,

                                                  /s/ *Daniel A. McGrath*

                                                  Daniel A. McGrath
                                                  (D.C. Bar No. 1531723)
                                                  Amy C. Vickery*
                                                  (*pro hac vice forthcoming)
                                                  Robin F. Thurston
                                                  (D.C. Bar No. 1531399)
                                                  Democracy Forward Foundation
                                                  P.O. Box 34553
                                                  Washington, D.C. 20043
                                                  (202) 448-9090
                                                  dmcgrath@democracyforward.org
                                                  avickery@democracyforward.org
                                                  rthurston@democracyforward.org